# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**ELLEN L. SPARKS,**
       **Plaintiff,**

                                **Civil Action No. 2:99CV109**

**v.**                                **(The Honorable Robert E. Maxwell)**

**COMMISSIONER OF SOCIAL SECURITY,**
       **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

## I.  Procedural History

Ellen L. Sparks ("Plaintiff") filed applications for DIB and SSI on August 31, 1995 (R. 353-56, 360-64).[1] Plaintiff alleged disability since September 1, 1992, due to a ruptured cervical disc with nerve root compression, degenerative arthritis in her neck, nerve damage in her left arm, headaches, dizzy spells, and depression (R. 376. 385, 389). Plaintiff's applications were denied at the initial and reconsideration levels (R.  365-75). Plaintiff requested a hearing, which

---

[1]Plaintiff filed an application for DIB on August 26, 1991.  On January 16, 1993, Administrative Law Judge Alfred J.  Costanzo awarded Plaintiff a closed period of disability from August 10, 1990, through June 30, 1992 (R. 344-48).

Administrative Law Judge Steven D. Slahta ("ALJ") held on December 17, 1997 (R. 133-42). Plaintiff waived her right to be present at the hearing; Plaintiff's attorney did not appear at the hearing (R. 130, 135). S. Thomas Serpento, Vocational Expert ("VE") testified (R. 134-42). On July 24, 1998, the ALJ entered a decision finding Plaintiff was not disabled under the Act (R. 112-22). Plaintiff appealed this decision to the Appeals Council, and it denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 34).

On August 19, 1999, Plaintiff appealed the Commissioner's decision to the United States District Court for the Northern District of West Virginia. Cross motions for summary judgment were filed, and on January 14, 2000, said motions were referred to the undersigned United States Magistrate Judge by the District Court for the preparation of proposed findings of fact and recommendation for disposition [Docket Entries 7, 8, 9, 10, and 11]. The undersigned submitted Proposed Findings of Fact and Recommendation for Disposition to the District Court on November 17, 2000 [Docket Entry 12]. On December 12, 2000, Plaintiff filed objections to the undersigned's Proposed Findings of Fact and Recommendation for Disposition [Docket Entry 13]. On February 4, 2002, 14 months after the Recommendation was entered and 3½ years after the ALJ's decision, Plaintiff filed a Motion to Supplement her Brief with Submission of Additional and Material Evidence [Docket Entry 14]. On April 4, 2002, Plaintiff filed a second Submission of Additional and Material Evidence [Docket Entry 15]. Defendant filed a Response to Plaintiff's Submission of Additional Evidence on April 22, 2002 [Docket Entry 16]. On August 19, 2002, the District Judge entered an Order granting Plaintiff's Motion to Supplement Her Brief with Submission of Additional and Material Evidence and Plaintiff's Submission of Additional and Material Evidence and remanding Plaintiff's case to the Commissioner of Social Security for further administrative action

[Docket Entry 17]. Based on that Order, Plaintiff's case in the District Court for the Northern District of West Virginia was closed. On October 3, 2002, the Appeals Council issued an order vacating the final decision of the Commissioner and remanding Plaintiff's case to an Administrative Law Judge for further proceedings consistent with the order of the District Court (R. 35).

On February 20, 2003, ALJ Slahta conducted a hearing on the entire record in this case (R. 145). Plaintiff, who was represented by Sharon A. Hayes, and VE Jim Ganol testified at the hearing (R. 143-82). On May 18, 2003, the ALJ entered a decision finding Plaintiff was not disabled under the Act (R. 31-48). Plaintiff appealed the ALJ's decision to the Appeals Council, and, on June 19, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 7-8).

On July 14, 2004, Plaintiff filed a motion to reinstate the instant civil case to the Court's active docket of cases [Docket Entry 18]. By Order entered on that same date, the District Judge granted Plaintiff's motion and the case was reopened [Docket Entry 19]. On January 25, 2005, Defendant filed a Motion for Summary Judgment and supporting memorandum [Docket Entry 25, 26]. Plaintiff filed an "Additional and Supplemental Memorandum in Support of Plaintiff's Motion for Summary Judgment" on January 25, 2005 [Docket Entry 27]. On February 22, 2005, Defendant filed a Reply to Plaintiff's Motion for Summary Judgment, and Plaintiff filed a Response Memorandum in Support of Plaintiff's Motion for Summary Judgment [Docket Entry 30, 31]. This case was referred to the undersigned United States Magistrate Judge by the District Court on September 28, 2005 [Docket Entry 32].

## II. Statement of Facts

Plaintiff was born on June 29, 1956, and was forty-six years old at the time the ALJ rendered

his decision in this case (R. 353). Plaintiff's past relevant work included that of medical secretary and insurance clerk (R. 92).

On February 15, 1990, Plaintiff was referred to James H. Wiley, M.D., for an evaluation (R. 520). His impression was for "cervical disc syndrome superimposed upon discogenic disease C5-6 (old hard disc)."

On April 9, 1990, Plaintiff was seen at University Health Associates by Kevin Halbritter, M.D. She presented with neck pain and informed him she had been taking Valium, which caused fatigue. Plaintiff informed Dr. Halbritter that she had also experienced "catching in her shoulder." Dr. Halbritter diagnosed neck spasm and prescribed Desipramine 25mg (R. 512).

On April 23, 1990, Plaintiff returned to University Health Associates. John Brick, M.D., conducted a neurological examination of Plaintiff. The examination was normal (R. 509-11).

On May 8, 1990, Dr. Brick interpreted Plaintiff's MRI as follows: "MRI disc C5-6 radiology report pending. Doesn't appear to impinge on cord. Feeling fair, neck still hurts. Most of pain is in L shoulder. C/O occasional weakness R arm. Describes as 'catch' in shoulder & then arm drops. . . . She tried PT & couldn't keep it up because of work. Still doing exercises from PT & she thinks it helps. . . . She understands risks of Valium & knows she needs to limit intake" (R. 503-04).

On May 21, 1990, Dr. Brick corresponded with Roy Abruzzino and informed him Plaintiff's work should be limited to twenty hours per week (R. 502).

On May 23, 1990, Plaintiff was examined by G. Robert Nugent, M.D., of University Health Associates (R. 508). Dr. Nugent recounted Plaintiff's statements regarding her condition as follows: 1) she had experienced posterior neck pain three years earlier; 2) her neck pain was made worse by sitting for long periods of time at a computer; 3) her pain was relieved when she would lie

down; 4) gardening and house work exacerbate her neck pain; 5) there are "no specific movements or activities" that worsened her pain; 6) in addition to neck pain, Plaintiff experienced shoulder blade pain that radiated into one arm then the other arm; 7) she experienced occasional numbness in the medial two fingers of her right hand and the thumb of her left hand; 8) Plaintiff did not experience weakness in her arms or hands, but she experienced a weakness "in general"; 9) she wore a cervical collar at night; and 10) Plaintiff had been working half time since March, 1990 (R. 506).

Dr. Nugent's examination of Plaintiff revealed she had full range of motion of her head and neck, postero-lateral extension and compression caused some neck pain, there was no radicular component to her pain, there was no point tenderness over Plaintiff's cervical spinous processes, no weakness of her upper extremities, some hypalgesia to pinprick testing of her left "little" finger, and equal and normal deep tendon reflexes with no pathologic reflexes (R. 506).

Dr. Nugent's review of Plaintiff's "spine films" revealed "some mild degenerative changes." An MRI revealed what appeared to be a "disc bulging at the C5-6 level, predominantly to the left." Dr. Nugent opined there were "no good clinical findings of C6 nerve root compression that would go along with the MRI," and Plaintiff's "sensory change" was "in the C8 distribution on the left and her arm pain [was] equally severe on each side. These findings [were] inconsistent with the MRI." Dr. Nugent wrote he was not convinced that the bulging disc at C5-C6 caused Plaintiff's neck and shoulder blade pain (R. 506). Dr. Nugent informed Dr. Brick that he had "placed [Plaintiff] on a trial of head-halter traction to be used in the supine position with 7 pounds of weight intermittently – an hour in and an hour out." Dr. Nugent concluded: "At the moment, it would appear that her present disability is somewhat out of proportion to the objective findings of a disease here" (R. 507).

On June 7, 1990, Plaintiff returned to Dr. Nugent for a follow-up examination. He noted

Plaintiff had been diagnosed with mild degenerative disc disease at an earlier date, she had been using the head-halter traction as prescribed, her "neuro" examination was intact, she presented with "mild stiffness in her neck," and she stated she felt "80%" better. Dr. Nugent prescribed 800mg Motrin, suggested Plaintiff swim as a form of exercise, and instructed Plaintiff to continue the use of the head-halter traction at seven pounds (R. 500).

Also on June 7, 1990, Plaintiff was examined by Dr. Brick at the Neurology Clinic at University Health Associates. It was noted she was "[d]oing better" in that she experienced less pain. Plaintiff, it was noted, was "still doing traction," which was "helping." Plaintiff had also been exercising. She informed the doctor that she was "[g]oing to try [M]otrin." Plaintiff stated she was feeling "about 40% better" and that she could type or write while at work. Plaintiff asserted that sitting worsened her condition. Plaintiff informed the physician that she intended to take a three-week medical leave of absence and that she planned to obtain an appointment with the pain clinic. Plaintiff stated she was going to "try swimming" (R. 501).

On June 29, 1990, Dr. Halbritter corresponded with Worker's Compensation Fund relative to his treatment of Plaintiff. Dr. Halbritter noted Plaintiff's complaints of pain and his courses of treatments for same. He also wrote that Plaintiff had undergone "neck films as well as an EMG which were essentially unremarkable." Dr. Halbritter opined that Plaintiff had experienced a decrease in neck pain, but had developed a weakness in her right arm and a "catching" in her shoulder. Dr. Halbritter further opined that Plaintiff had left scapular tenderness, cervical tenderness, and decreased strength in her left arm, but that her grip strength and sensation were intact (497). Dr. Halbritter wrote that Plaintiff's "work setting, which included sitting in front of a computer for an extended length of time . . ., may be contributing to her muscle spasms" (R. 498).

On July 9, 1990, Plaintiff was evaluated by Dr. Nugent. He observed Plaintiff's "motor"

was 5/5 throughout, her sensory was "intact," her spine was "n[on]/t[ender] by palpation" and her neck was "supple" (R. 496).

On July 26, 1990, Plaintiff was evaluated by Dr. Brick. She stated she "hurts all the time" and that she had constant pain in her neck, shoulder, and left upper back. Plaintiff informed Dr. Brick that she did stretching exercises each morning and that her condition had improved enough for her to "do garden work." Plaintiff stated her hand and foot occasionally swelled and that her knees and hips ached. Plaintiff informed Dr. Brick that if she kept "moving," she was "ok," but if she sat down, she got "stiff" and had to stand within ten minutes (R. 494). Plaintiff stated swimming and traction helped her condition, but that the cervical collar worn at night and Motrin had not helped. Plaintiff asserted she felt she could no longer "do her job." Plaintiff had made an appointment at the pain clinic, but did not keep that appointment. Dr. Brick noted he did not "have anything else to offer" Plaintiff and that she should seek treatment at the pain clinic (R. 495).

On August 8, 1990, Dr. Brick wrote a letter, wherein he noted Plaintiff complained of chronic neck pain, the neurology department did not feel she was a candidate for surgery, Plaintiff had taken medication and undergone physical therapy for her condition, and Plaintiff had been referred to the pain clinic. Dr. Brick requested modification of Plaintiff's work schedule (R. 493).

Plaintiff underwent a psychological evaluation at West Virginia University on August 22, 1990 (R. 458-62). Richard T. Gross, Ph.D., completed the evaluation (R. 462). She was referred by Dr. Brick for a "continuing pain complaint." Plaintiff stated her pain was episodic and localized in her left shoulder. Plaintiff stated she also experienced bilateral neck pain that was constant but varied in intensity. Plaintiff stated she had medicated her pain with Valium in the past and that the consumption of beer (one to two typically, not more than four) at night reduced her pain. Plaintiff

7

had been first married at age fourteen for 18 months and married a second time for four years. She was currently married for six years to her third husband, and she had been working for West Virginia University for the past four years doing typing and computer billing (R. 458).

Plaintiff reported she had sought psychological counseling in the past, she had two suicidal episodes as a teenager, and she was diagnosed with panic attacks at the age of twenty-nine (R. 459). Plaintiff reported she was "tired of pain" and that she ignored stress. Plaintiff stated she had passive suicidal ideation because of pain, but she would not act on those thoughts. She said she was fatigued, but enjoyed swimming, gardening, traveling, reading, and spending time with her family.

Mr. Gross observed Plaintiff was cooperative, polite, and mildly to moderately anxious. Her appetite was normal, she had a discontinuous sleep pattern, she was oriented to person, place, and time, and she was "quite worried about her continuing pain" (R. 460). Plaintiff's test results were as follows: Beck Depression Inventory was mildly depressed range; Spielberger Trait Anxiety Inventory was within normal range; and on the McGill Pain Questionnaire, Plaintiff' sensory was twenty-two, affective was eight, evaluative was five, and miscellaneous was nine. Mr. Gross noted Plaintiff was experiencing reactive depression, feelings of anxiety, and feelings of insecurity and inadequacy (R. 461). Mr. Gross noted the psychological evaluation indicated no evidence of exaggerated pain behaviors, hypochondriasis, or conversion reaction. Mr. Gross opined the following: "Clinical interview was consistent with standardized testing suggesting a dysphoric and anxious individual who is lacking in skills to cope with the implications of her continuing pain. Her current style of 'ignoring' does appear to be inadequate with depressive symptoms clearly breaking through and underlying anxiety symptoms present as well." His diagnostic impressions were for 1) psychological factors affecting physical condition and 2) dysthymia verses depressive disorder not

otherwise specified (R. 462).

On August 24, 1990, Eric M. Humphreys, M.D., a fellow at the Plain Clinic, corresponded with the Worker's Compensation Fund at the request of Plaintiff relative to her condition (R. 486-88). Dr. Humphreys noted Plaintiff's pain had improved since she had not worked, but that she still experienced "some residual pain which does not limit her activities" (R. 486). Dr. Humphreys interpreted the diagnostic studies done of Plaintiff as a negative EMG, a MRI that showed mild bulging at C5-C6, and cervical spine x-ray that showed minimal degenerative changes between C3 and C5. Dr. Humphreys opined Plaintiff's condition did not involve any spinal cord involvement or nerve root compression at the foramina level. Dr. Humphreys wrote Plaintiff's diagnosis was for "myofascial pain or fibrositis" and "mild . . . depression and anxiety" (R. 487).

Plaintiff was treated at West Virginia University Hospital Pain Management Center from September 20, 1990, through May 7, 1991 (R. 484, 481, 482, 483, 480, 474, 473, 470, 469, 468).

On December 13, 1991, Plaintiff was evaluated by Dr. Wiley for cervical spine pain with radiation into her left arm. He observed mild limitation of motion in Plaintiff's left shoulder and moderate limitation of motion in her cervical spine. Dr. Wiley noted Plaintiff experienced pain and tenderness in her left levator scapular area and neck. His review of Plaintiff revealed "cervical lordosis with slight subluxation of 4 on 5 and a hard disc posteriorly at C5-6" (R. 300). Dr. Wiley noted Plaintiff had "considered the possibility of surgery for years, but [had] been discouraged from having surgery by her treating physicians at the West Virginia University Hospital." Plaintiff informed Dr. Wiley that she desired a referral to the Cleveland Clinic. Dr. Wiley's impression was that Plaintiff was "literally crippled by her injury at this time and that she should be referred for further consideration for surgery." He noted Plaintiff had "gotten worse since the previous visit" and

that she had "attempted a retraining program, but was unable to complete this" (R. 301).

On February 20, 1992, Plaintiff was evaluated by Dr. Wiley for Workers' Compensation. Dr. Wiley's examination of Plaintiff revealed she was tender in the mid and lower cervical spine areas. Plaintiff's cervical spine range of motion was minimally limited, compression of shoulders was negative, sensation was intact, grip was good, and stresses on upper extremities were negative for pain (R. 318). Dr. Wiley reviewed an April 23, 1990, x-ray of Plaintiff's cervical spine, which showed "reversal of the normal lordotic curve with the maximum reversal at 4-5 level"; minimal subluxation of "3 on 4 and 4 on 5"; and a mild tilt to the right. The odontoid view was within normal limits. Dr. Wiley also reviewed a May 8, 1990, MRI provided by Plaintiff, which showed a bulge at the "4-5 level with minimal identation of the thecal sac." Dr. Wiley reviewed the x-rays taken of Plaintiff in his office at the time of the examination, and he opined they showed some degenerative joint disease at "5-6 and old hard disc blocking the motion of flexion." Additionally, "AP of the cervical spine [showed] straight cervical spine with no cervical ribs." Dr. Wiley's impression was for cervical disc syndrome superimposed upon discogenic disease C5-C6. He opined Plaintiff was unable to "do her work as is" and that she should be retrained for a different type of work. Dr. Wiley noted Plaintiff, "in some areas – would be a candidate for interior fusion"; however, Plaintiff felt she was "better now that she [had] stopped her job" and did not prefer surgery. Dr. Wiley rated Plaintiff's permanent physical impairment at six percent (R. 319).

On February 21, 1992, Richard Anderson, M.D., wrote that a myelogram and CT Scan revealed a large, hard and soft disc with osteophyte at C5-C6 in Plaintiff's left central paracentral region. He noted his examination of Plaintiff revealed left grip weakness, sensory hypesthesia of the left second finger, and no nuchal rigidity. Dr. Anderson wrote he discussed and recommended

surgery with Plaintiff (R. 467).

Dr. Kaufman performed a discectomy and bone graft at C5-C6 on Plaintiff on May 13, 1992.

Dr. Wiley noted Plaintiff was had been "doing extremely well" a month later, but her "arm flared again" six weeks after the surgery. Plaintiff informed Dr. Wiley she had improved but had "lost some coordination" and dropped things. Plaintiff stated she was "not doing much physical activity." Physical examination revealed diminished sensation in the left little finger; normal upper extremity strength except for weak left arm flexion and elevation; active and equal deep tendon reflexes; mild cervical spine limitations; and full range of motion in shoulders, elbows, wrists, and hands (R. 518). Plaintiff stated she had mild pain and tenderness at left vertebral prominence and cervical spine. X-rays indicated anterior interbody arthrodesis of C5-C6, which was healing well. Dr. Wiley's diagnosis was cervical disc syndrome, status post discectomy and fusion at C5-C6. Dr. Wiley noted Plaintiff was engaged in a walking program and physical therapy, and he recommended she continue those. He opined Plaintiff was temporarily totally disabled at that time, but she could return to work within three to four months (R. 519).

The first ALJ in 1993 awarded Plaintiff a closed period of Disability through June 30, 1992.

On March 8, 1993, David A. Stoll, M.D., performed a consultative examination of Plaintiff, noting Plaintiff's primary complaints were neck pain on the left with pain radiating to her shoulder and headaches, and her secondary complaints were left arm pain, which radiated to her shoulder, elbow, and small finger; left arm weakness; and numbness and tingling in her index finger and thumb (R. 463). Plaintiff said her "problems" were mild but constant and that she was undergoing physical therapy. Plaintiff's medications included Flexeril, Elavil, Motrin, and Valium. Physical examination revealed the following: 1) mild degree of posterior neck tenderness that was

11

significantly increased with palpation over spinous processes; 2) limited neck motion; 3) flexion that brought her chin to within three to four "fingerbreaths" of her chest; 4) no neck extension but an ability to tilt her head posteriorly; 5) lateral bending at thirty degrees and rotation of sixty degrees bilaterally; 6) pain-free ranges of motion in her shoulder, elbow, wrist, and hand; 7) shoulder, elbow, wrist, and hand were non-tender to palpation; 8) fair degree of diffuse weakness of left upper extremity rated at 4+/5; 9) weakness was break away type and non radicular, with no fit to any specific peripheral nerve; 10) mildly decreased sensation to light touch in small finger, index finger, and thumb; and 11) markedly positive Tinel's over the cubital tunnel. Dr. Stoll reviewed the MRI from 1990, the CT myelogram from 1992, and postoperative cervical spine x-rays and opined they revealed "a fairly large C5-6 disc with osteophyte impinging upon the thecal sac" and "no other significant radiographic evidence of disc herniation." He noted the postoperative x-rays showed "good fusion of the C5-6 vertebral bodies without significant subluxation." Dr. Stoll's impression was for residual mechanical neck pain status post cervical fusion, residual mild left upper extremity weakness secondary to disc herniation, and cubital tunnel syndrome (R. 464). Dr. Stoll recommended Plaintiff continue physical therapy, as it was causing improvement (R. 465).

On May 27, 1993, Plaintiff returned to Dr. Wiley. On physical examination, Plaintiff had a much improved range of motion of her cervical spine, with less than twenty-five percent limitation of flexion and less than twenty-five percent loss of extension (R. 515-16). Plaintiff told Dr. Wiley that on a previous examination, Dr. Kaufman wanted to perform another myelogram; however, she refused. She also declined the use of a cast designed for the treatment of possible cubital nerve entrapment that Dr. Stoll had suggested (R. 515). Dr. Wiley stated that additional information could be obtained by additional x-rays of the cervical spine; however, Plaintiff declined those tests,

stating that she desired no further x-rays. Dr. Wiley noted Plaintiff was three years post injury and one year post surgery and had improved a great deal since her last visit (R. 516). Dr. Wiley opined Plaintiff had reached maximum medical improvement and estimated she suffered a fifteen percent whole body permanent physical impairment (R. 516-17).

On April 1, 1993, a Case History was completed at the office of chiropractor Stephen D. Herto. Plaintiff told the chiropractor she had had disc surgery for fusion of C5-C6 on May 13, 1992; an x-ray in October, 1992; MRI's in May, 1990, and December, 1991; lab exam in May, 1992; and physical exam in August, 1991. She participated in moderate exercise (R. 536). She asserted she had experienced headaches and backaches in the past, loss of sleep, fatigue, numbness or pain in extremities, weakness, and pain between her shoulders. She was currently taking Flexeril (R. 535).

On July 23, 1993, Dr. Herto wrote to the State Workers' Compensation Division, stating that Plaintiff had "improved tremendously through July 23, 1993" and was "being seen two times per week" for treatment by him. He requested Plaintiff "remain temporarily, totally disabled beyond May 9, 1993," because extended work that involved sitting or standing caused her pain to return. He opined Plaintiff would "have some sort of permanent disability" and agreed with Dr. Wiley's projection of a fifteen percent permanent disability rating (R. 553).

Orthopedic specialist Shen K. Wang, M.D. examined Plaintiff on November 18, 1993. Her physical examination was essentially within normal limits (R. 528). Plaintiff's upper extremities showed "no limitation of motion at the shoulder, elbow, forearm, wrist and hands. There [was] no sensory change by pin-prick test nor muscle weakness. All deep tendon reflexes of both upper extremities [were] essentially active and symmetrical including biceps, triceps, brachio-radialis and extensor carpi-radialis. [Plaintiff had] . . . very good grip on both hands." Dr. Wang opined that

Plaintiff had reached maximum recovery and no further treatment was needed. He estimated her permanent partial impairment due to her neck was at fifteen percent (R. 529).

On July 29, 1994, James E. Beitzel, M.D., wrote a letter to Plaintiff's counsel relative to Plaintiff's depression. He noted that Plaintiff was prescribed Paxil on September 29, 1993. Plaintiff was last seen by Dr. Beitzel on June 15, 1994. He noted Plaintiff "rarely" forgot to take her Paxil, but she continued to experience symptoms of depression. Dr. Beitzel stated, however, that Plaintiff had "changed her dose to ½ tab after experiencing sweating episodes." He opined that Plaintiff's psychiatric diagnosis was depression, the depression was related to her previous neck symptoms, and her treatment for depression was effective but her "changes in mood and depressed affect would limit her ability to return to work" (R. 524).

On January 26, 1995, chiropractor Herto wrote a "narrative report" regarding Plaintiff's condition. He noted Plaintiff was in "obvious discomfort" during examination and she "was frustrated with the multiple number of pain medications and was currently taking the drug Flexeril." He opined Plaintiff's "AP and Lateral cervical films revealed a cervical hypolordosis with C5-6 fusion" (R. 548). Dr. Herto's clinical impression was for "cervicalgia and cervical radiculopathy as a latent effect of cervical fusion." His preferred course of treatment was chiropractic adjustments, corrective exercises, cervical pillow, and trigger point therapy. He opined that she would require ongoing chiropractic care one to two times per month for several years (R. 549). He also opined Plaintiff would "progress adequately to return to some type of employment" that would involve limited duties, and her condition would "leave a permanent disability" (R. 550).

On August 30, 1995, Plaintiff completed an Adult Activities Questionnaire in connection with her disability applications (R. 385-94). She stated she had trouble sleeping because of muscle

14

spasms in her neck, pain in her left arm, and depression. She asserted she took naps throughout the day because of chronic fatigue. She claimed she needed assistance with washing, bathing, and dressing (R. 385). She alleged she sometimes had periods of debilitating pain that lasted from two days to six weeks, during which she could not care for herself, and her husband and son had to prepare meals. She did laundry, paid bills, managed bank accounts, and ran errands, but said she needed assistance completing household chores (R. 386). She shopped for food and drove a vehicle, but had to recline in the passenger's seat if riding over five miles. She read books three hours per day, watched television four hours per day, and listened to the radio one hour per day (R. 387). She cooked dinner everyday, cleaned once a week, did the laundry, vacuumed, and dusted with assistance from family members, shopped for groceries twice per week, and occasionally visited with neighbors and friends (R. 392).

On September 22, 1995, Dr. Herto received a letter from West Virginia Workers' Compensation fund informing him that Plaintiff's claim for temporary total disability benefits had been reopened and requesting written documentation of Plaintiff's condition (R. 537).

On September 25, 1995, chiropractor Herto completed a Medical Report of Plaintiff's condition, noting he had seen Plaintiff over one-hundred-and-twenty times and she was in "persistent recurring neck & arm pain" and experienced headaches (R. 530). He opined Plaintiff had "progressed tremendously with chiropractic care," and without such treatment, she would be "bedridden" (R. 531). He diagnosed cervical radiculitis and failed cervical fusion. His recommended course of treatment was cervical and thoracic manipulation, traction, application of ice, massage as needed, and corrective exercises (R. 533).

On October 16, 1995, William Fremouw, Ph.D., completed a psychological interview of

Plaintiff. Plaintiff stated she had taken Paxil for depression but stopped taking it because she could not afford it. She said she had recently begun experiencing friction at C6-C7 and had experienced sleep disturbances in that she slept for eighteen hours on some days and four hours on other days. She rated her back pain as eight on a scale of one to ten, but took no medication for the pain (R. 538). She often saw Dr. Herto daily for chiropractic care and drank two glasses of wine at night to treat her pain (R. 539). According to Dr. Fremouw, Plaintiff did not appear distressed.

Plaintiff's Verbal IQ was 103, Performance IQ was 107, and her full scale IQ was 105. Plaintiff read at the post-high school level and performed math at a second grade level. Dr. Fremouw noted her math score was not valid due to her discomfort (R. 540). Dr. Fremouw diagnosed dysthymia. Plaintiff listed her activities of daily living as follows: rose at 4:00 a.m. or 7:00 a.m.; assisted husband and son in leaving the home for work and school by 8:30 a.m.; did housework in the morning; returned to bed at noon to watch television, read, and nap; rose in late afternoon; prepared dinner for family; watched television in the evening; and retired to bed between 6:00 p.m. and 9:00 p.m. Plaintiff asserted she drove short distances, marketed twice per week, attended sessions with her chiropractor once per week, read, and crocheted. Plaintiff stated she sometimes needed assistance bathing and dressing because of "problems with her left arm and shoulder." Dr. Fremouw opined Plaintiff's pace and concentration were excellent and she would be able to manage benefits in her own behalf (R. 541).

On October 19, 1995, James Capage, Ph.D., completed a Psychiatric Review Technique ("PRT") of Plaintiff, opining Plaintiff had dysthymia, and concluding she had a slight degree of limitation in her activities of daily living and ability to maintain social functioning; seldom experienced any limitation in her ability to maintain concentration, persistence or pace; and had

never experienced an episode of decompensation (R. 456).

On October 20, 1995, chiropractor Herto wrote to the State Workers' Compensation Division regarding Plaintiff's having been denied disability benefits. He noted that Plaintiff had attempted to return to work, which resulted in her condition being exacerbated in that she experienced radicular-type pain from C5-C6 to her fingertips on her left hand. He opined Plaintiff's continued degeneration of her cervical spine was aggravated by her attempting to work. He opined that Plaintiff's diagnosis was cervical radiculopathy, a progression of her "old injury," and opined she was temporarily totally disabled (R. 555).

On October 26, 1995, Charles M. Paroda, D.O., Ph.D., examined Plaintiff for the State Disability Determination Service. Plaintiff's chief complaint was for a ruptured disc in her neck. She stated she had heart palpations which were corrected by her chiropractor, but she had flu-like symptoms every other month (R. 542). Plaintiff smoked one cigarette daily and took no medications. She drank up to four glasses of wine a day for her pain.

Upon examination, Plaintiff was comfortable sitting, standing, and supine, and her mental state and intellectual functioning appeared normal. Her neck was supple (R. 543). Her extremities appeared normal and palpation of her shoulders, elbows, wrists, hands, knees, and feet revealed no swelling, tenderness, redness, or warmth. Plaintiff's left elbow had normal range of motion. She exhibited some mild tenderness in the trapezius area of the cervical spine and complained of pain with extension and flexion. Her lumbar spine had a normal range of motion. Neurologically, Plaintiff was grossly intact with no focal deficits (R. 544). Her motor strength and deep tendon reflexes were equal bilaterally in upper and lower extremities (R. 545). Dr. Paroda believed Plaintiff's restriction of interest and activities were unlikely due to psychiatric difficulties. He

opined there was no evidence of deterioration of personal habits and Plaintiff could manage any benefits awarded (R. 546).

On November 15, 1995, State agency reviewing physician Fulvio R. Franyutti, M.D. reviewed the evidence and opined Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight hour workday, sit for a total of about six hours in an eight hour workday, and had unlimited push and pull (R. 442). She had no manipulative, visual, or communicative limitations (R. 443, 445). She could occasionally climb, balance, stoop, kneel, crouch, or crawl (R. 444). She should avoid concentrated exposure to extreme cold, extreme heat, and hazards, but had no limitations regarding wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation (R. 445). Dr. Franyutti opined Plaintiff's RFC was for a full range of light work (R. 446).

On December 13, 1995, Dr. Herto received a Radiographic Biomechanical Report from Bruce A. Rodan, M.D. (R. 556). Dr. Rodan compared the October 26, 1992, March 31, 1994, and October 11, 1994, x-rays of Plaintiff's cervical spine and opined the following: 1) "[l]oss of angular motion segment integrity [was] suggested at C5 and C6"; 2) hypomobile joints at C3-4, C4-5, and C5-6; and 3) comparative findings appeared to be relatively consistent (R. 557).

On January 12, 1996, Dr. Herto wrote to Workers' Compensation requesting Plaintiff be awarded temporary total disability at twenty-five percent. He opined Plaintiff experienced continued signs of disc degeneration, ligamentous damage, and loss of cervical lordosis (R. 547).

In a handwritten letter dated January 14, 1996, Plaintiff stated her doctors' reports did not explain her condition completely. She claimed her pain was constant and had been constant for almost ten years. She wrote she experienced pain and loss of function in her left arm and "increasing

symptoms" in her right arm. She asserted that she had experienced episodes of total bed confinement and could not leave her house due to the constant pain she experienced (R. 422). She wrote that she required assistance dressing, undressing, showering, and eating, that she could only ride in a car for fifteen minutes, that she could sit only long enough to eat a meal, and that she could not move her neck (R. 423).

On January 22, 1996, Plaintiff was evaluated by psychiatrist Paul L. Claussell, M.D. Plaintiff stated she had an "unstable neck;" experienced constant pain at the base of her skull that radiated to her left shoulder blade; had "lost the use of her left arm secondary to a ruptured disc in her neck;" visited a chiropractor two to three times per month for cervical vertebrae adjustments, which were "beneficial and helped keep her pain down to a tolerable level;" had to reduce her visits to the chiropractor to one time per month because of cost and this frequency was not "enough to be of benefit to her;" and wore a cervical collar as necessary for stabilization when she sat or rode in a car (R. 571). Plaintiff described her pain as a "shock sensation as if a nerve [was] being pinched," with pain radiating down her left arm and resulting in muscle spasms. She stated muscle spasms were present in her neck all day, her pain was an eight on a scale of one to ten, the dull aching pain in her left arm was present all the time and rated at a five on a scale of one to ten, and her pain lasted for several days and required her to spend much of that time in bed waiting for it to decrease. She stated she also suffered from flu-like symptoms, which lasted for three days and disappeared and which her doctors "indicated" were related to her pain (R. 573). Plaintiff informed Dr. Claussell that she smoked two cigarettes per day and consumed "from one to four, four to five ounce glasses of wine, two to three times per week at bedtime" because it helped her relax and fall asleep (R. 572).

Plaintiff told Dr. Clausell that her physicians referred to her condition as a "long term wear

19

and tear injury." She recounted her medication history as follows: 1) Valium for one-and-a-half years for pain; 2) Flexeril in conjunction with Valium for pain; 3) Tylenol with codeine for pain; 4) Paxil for depression; and 5) Elavil, Desipramine, and Imipramine for sleep, from which she experienced side effects of constipation and weight gain (R. 572-73). Plaintiff stated she had been treated with traction, three courses of physical therapy, home traction, local injections at a pain clinic, cervical fusion surgery, and chiropractic therapy (R. 573).

Plaintiff's activities of daily living were as follows: 1) she slept for only a few minutes (forty-five minute intervals) at a time; 2) when she failed to sleep, she watched television; 3) she could no longer crochet or read because of pain; 4) she rose at 6:30 a.m. and drank tea, watched news, and visited with her husband and son before they left for work and school, respectively; 5) she returned to bed and watched morning "talk shows;" 6) she rose at noon and prepared soup and toast for her lunch; 7) she sat in a recliner throughout the afternoon; 8) she supervised her husband and son in their dinner preparations and sometimes laid the table; 9) she watched television; 10) she retired to bed between 8:30 p.m. and 9:00 p.m. and watched television; and 11) she relocated to another bed after 10:00 p.m. if she was unable to fall asleep (R. 574).

Plaintiff described her functional limitations to Dr. Claussell as follows: she could stand for one to three minutes before her pain worsened; she could walk for ten to fifteen minutes "on a good day" before her pain increased; she could sit "still for two to three minutes"; she could sit for fifteen minutes if she was able to change positions frequently; she could lift one gallon of milk with her right hand and arm; she could lift nothing with her left hand or arm; and she could not drive long distances (R. 573).

Dr. Claussell's mental status examination revealed Plaintiff was oriented to time, place,

person, and circumstance. Her immediate memory was fair and remote memory was intact (R. 575). Her affect was sad and tearful during the examination. Her speech was relevant and coherent. She described passive suicidal ideation, but no active suicidal or homicidal thoughts. She denied psychotic symptoms. Her judgment was adequate (R. 576).

Dr. Claussell diagnosed mood disorder due to injury with depressive-like episode (severe). At Axis IV, he found Plaintiff had environmental and psychosocial stressors including difficulty with adjustment to life cycle transition, inability to work, inadequate finances, and inadequate health care secondary to refusal of Workers' Compensation to pay for chiropractic treatments and medication. He assessed her GAF at 50 (R. 576).

Dr. Claussell concluded Plaintiff was able to tolerate her pain and was much less depressed when she received chiropractic treatments two to three times per month. Without those treatments she experienced increased pain and worsened depression. He recommended "additional treatment include initiation of and payment for an antidepressant such as Paxil which she previously took and from which she received significant relief from her depression; payment for the patient's chiropractic care." Dr. Claussell opined Plaintiff had not reached a maximum degree of improvement and would not benefit from vocational rehabilitation (R. 577).

On January 31, 1996, Plaintiff was interviewed and examined by orthopedic specialist P. Kent Thrush, M.D. Dr. Thrush noted Plaintiff had followed-up with the neurosurgery clinic for several months after her 1992 surgery, but did not return to her treating physician or to West Virginia University for re-evaluation after the fall of 1992. Plaintiff stated she was traumatized by the surgery and was afraid to return to West Virginia University, seeking instead treatment from a chiropractor. She complained of chronic neck pain which radiated down her left arm, thumb, and index finger.

21

She stated she wore a cervical collar intermittently, took no prescribed medications, and experienced episodes of spasms in her neck and arm (R. 579).

Dr. Thrush's physical examination of Plaintiff revealed: 1) she experienced discomfort on cervical spine range of motion exam; 2) her extension was 15 degrees and flexion was 15 degrees; 3) her right and left lateral rotation was 40 degrees; 4) her reflexes were 1+ in her right upper extremities; 5) her left-extremity reflexes were "very difficult to test" because of complaints of pain; 6) her right and left mid forearm and mid upper arm circumference were equal; 7) she had no specific muscular atrophy; 8) she had normal range of motion in her fingers and wrists; 9) she was able to make a fist and completely extend her fingers; 10) she had poor muscular effort in all muscle groups in her left upper extremity due to her "subjective" pain and not atrophy; and 11) her reflexes were normal in her lower extremities with no motor sensory deficits (R. 580-81).

Dr. Thrush x-rayed Plaintiff's neck, finding obliteration of the disc space at C5-C6 consistent with solid fusion. He also observed straightening of Plaintiff's cervical lordosis, but no other findings. Dr. Thrush's diagnosis was for status post cervical disc herniation at C5-C6 with treatment by anterior cervical discectomy and fusion and continued cervical pain and left radicular symptoms. He recommended that Plaintiff return to neurosurgeon Dr. Kaufman for further evaluation and undergo an MRI scan of her cervical spine. He opined "further chiropractic treatment would [not] be of any long term benefit" (R. 581). He noted Plaintiff's permanent partial impairment was at fifteen percent, and concluded that Plaintiff should not be placed back on temporary total disability for chiropractic treatment, but "might need to be placed back on temporary total disability" for further treatment at the neurosurgery clinic (R. 582).

On March 1, 1996, a State agency physician reviewed the October 14, 1995, findings of Dr.

22

Capage as to his Psychiatric Review Technique of Plaintiff and affirmed same (R. 449).

On April 24, 1997, Plaintiff completed a Social Security Administration form asserting she wished to proceed with a hearing without counsel and that she would "not be able to attend any hearing." She wrote that the Commissioner should "decide" her claim "using my evidence in my file" (R. 590).

At the December 17, 1997, administrative hearing, the VE testified that Plaintiff's past work ranged from semi-skilled to skilled sedentary exertional work (R. 136). He testified that her knowledge of basic business management practices would be transferrable to jobs as medical records clerk, receptionist, cashier, sales clerk, and typist (R. 136-37). The ALJ asked the VE to estimate the numbers of jobs available for a person of Plaintiff's age, education, and work history, with a physical ability to perform only light and sedentary work with a sit/stand option, not requiring repetitive overhead reaching. The VE testified that such a person could perform the job of typist (R. 137). The ALJ then asked the VE to further assume that Plaintiff would be restricted to low stress, unskilled entry level work, requiring only one and two step processes and would require her to work with things rather than people. The VE testified that such a person could perform the jobs of non-U.S. Post Office mail clerk (151,000 jobs nationally) and hand packer (219,000 jobs nationally) (R. 138-39). The VE testified that if the person could work with people instead of exclusively with things, other jobs would be available, such as cashier (200,000 jobs nationally) (R. 139-40). The VE believed that if Plaintiff had severe pain that eroded her ability to concentrate and depression that imparted a difficulty with emotional adjustment, especially with staying on task, Plaintiff would be unable to perform any of the jobs he listed (R. 141).

Evidence Submitted Subsequent to the First Administrative Hearing, ALJ's Decision, and Magistrate

The first administrative hearing was held in December 1997. The ALJ's decision was entered on July 24, 1998. The last medical evidence of record at that time was from early 1996. After the ALJ's decision, Plaintiff submitted to the Appeals Council a one-page document from her chiropractor dated September 2, 1998. There is no further medical evidence from that date through the date of the Appeals Council decision in June 1999, and on through the Magistrate Judge R&R dated November 17, 2000.

The next medical evidence was submitted to the Court in September 2001, the report of a cervical MRI performed by Dr. Hogg at the request of Plaintiff's chiropractor. It showed "overall height of the cervical vertebral segments" was preserved. Dr. Hogg opined Plaintiff experienced a "slight straightening of the cervical vertebral segments from approximately the C3 through C6 levels" and that the "sagittal images [demonstrated] rather diminutive ventral and dorsal subarachnoid space," which indicated a "somewhat congenitally diminutive spinal canal." At Plaintiff's C2-C3 level, Dr. Hogg observed a diminutive central canal, "but no compromise of the neural foramina." At the C3-C4 level, Dr. Hogg observed a "near-complete effacement of dorsal and ventral subarachnoid space" and "mild narrowing of the left neural foramen, but no focal disk bulge or herniation." At the C4-C5 level, Dr. Hogg opined Plaintiff had a "localized displacement of disk material in the subarticular zone on the left, compatible with a disk herniation of extrusion configuration" and what appeared to be a "compromise of the medial portion of the foramen on the left . . . [with] endplate osteophytes" present (R. 611). He found her central canal to be diminutive "with near-complete absence of ventral and dorsal subarachnoid space," but with "no cord compression" (R. 611-12). At the C5-C6 level, Dr. Hogg observed "diminutive height of the disk

and some type two degenerative endplate" that signaled "change in the adjacent inferior C5 and superior C6 vertebrae." He opined Plaintiff's "central canal [was] diminutive on a congenital basis with small ventral and dorsal subarachnoid space" and that she experienced "localized displacement of disk material in the midline and also in the left subarticular zone." At the C6-C7 level and the C7-T1 level, Dr. Hogg found no focal disk bulge or herniation or no central spinal canal or foraminal encroachment (R. 612).

Dr. Hogg's impression was for disk herniations at C5-C6 and C4-C5 levels on the left "with mass effect on the medial portion of the left neural foramen at each of these two levels. . . . superimposed on a congenitally diminutive central spinal canal with relatively little preserved subarachnoid space dorsal and ventral to the spinal cord. Degenerative endplate change with loss of disk height [was] noted at the C5-C6 level." Dr. Hogg noted "[c]orrelation for the presence of absence of a left C5 or C6 radiculopathy may be helpful" (R. 612).

Plaintiff underwent chiropractic treatments at Atlas Chiropractic on October 9, 10, 11, 12, 16, 18, 23, 25, and 30, 2001; November 1, 6, 8, 14, and 20, 2001; December 4, 7, 11, 18, and 26, 2001; January 2, 4, 11, 18, 25, and 29, 2002; February 1 and 8, 2002 (R. 615-19).

On February 18, 2002, James E. Riggs, M.D., examined Plaintiff. He reported that, on examination, Plaintiff exhibited some decreased reflexes at the right biceps and "give away weakness on the right arm secondary to pain." He opined Plaintiff undergo an EMG study to determine the cause of her right arm symptoms and a neurosurgical evaluation (R. 613).

Plaintiff received chiropractic treatment on February19, 26, and March 12, 2002 (R. 618).

On March 18, 2002, Plaintiff presented to Erika Pallie, M.D., for the first time, to establish primary care. Plaintiff reported her activities of daily living included bathing herself and cooking.

25

Plaintiff told the doctor she had spring water and wood heat, and stated that she had difficulty doing the tasks she needed to do – splitting wood, carrying water, doing dishes, and vacuuming – "when her pain is up." Plaintiff also told Dr. Pallie she had trouble looking down and dropped things. She said she had taken Percocet, which made her vomit; ibuprofen, which caused epigastric pain; Alleve, which caused depression; Tylenol, which "[helped] a little bit but not a lot"; Vioxx, which ultimately caused edema; Celexa, which caused palpitations; Valium and Flexeril, which caused depression; Paxil, which caused anorgasmia; and Amitriptyline, which caused an intoxicating effect. Plaintiff stated she had recently obtained Celebrex from a friend and it offered "some relief." She said she was also getting chiropractic adjustments on a weekly basis, occasional massage therapy, and occasional acupuncture, which helped her "to tolerate her discomfort" (R. 638).

Upon examination, Dr. Pallie observed Plaintiff's neck was "very stiff with decreased flexion and bilateral rotation,"her right shoulder was tender, paraspinal muscles were tender, extremities had full range of motion, and right hand had decreased strength. Dr. Pallie opined Plaintiff experienced chronic pain due to ruptured discs in her neck and was unable to work to support herself. She suggested Plaintiff apply for Workers' Compensation. She increased Plaintiff's Celebrex to 200mg, suggested she "take more 5HTP," and referred her to Atlas Chiropractic (R. 639). Plaintiff received treatment at Atlas Chiropractic on March 20, 2002 (R. 618).

On March 21, 2002, Dr. Pallie wrote a letter to the Clerk of the United States District Court for the Northern District of West Virginia, recounting Plaintiff's work efforts, employment efforts, and medical history (R. 636). She wrote that Plaintiff's pain was "chronic and unrelenting" and that she experienced decreased strength in her right arm and right hand; decreased biceps reflex in her right arm; decreased brachioradialis reflex in her right arm; tenderness in her neck; tenderness in her

cervical spine; and latissimus, deltoid, and trapezius tenderness. Dr. Pallie requested the denial of Plaintiff's application for Social Security Disability be reconsidered (R. 637).

Plaintiff received chiropractic treatment on March 27, and April 19, 2002 (R. 617-18).

On April 17, 2002, Dr. Pallie conducted a second examination of Plaintiff. Plaintiff presented with chronic neck pain with radiation down her arm. Dr. Pallie noted Plaintiff had had an EMG which was normal, meaning Plaintiff was not "going to be able to be relieved by any surgical intervention." Plaintiff reported she still experienced difficulty sleeping because of the pain and that taking Celebrex "twice a day . . . didn't make any difference in her pain level." Plaintiff rated her pain as "3" on a scale of "10." She said the Celebrex helped a lot and decreased the pain from a "7" down to a "3." She reported she was receiving chiropractic treatments once per week, but was no longer receiving acupuncture treatments or professional massages. She was "able to walk and get a little bit of exercise, which [was] very helpful for her general spirits and well-being." Dr. Pallie reported she had prescribed antidepressants, but Plaintiff reported palpitations and having to stop the medication. Dr. Pallie noted there was no significant change in Plaintiff's physical exam. Her neck was tender, her paraspinal muscles were tender, her rhomboids and trapezius were tender, and her right hand was weak. She continued Plaintiff on Celebrex, suggested she continue chiropractic treatments, and recommended massage therapy. Dr. Pallie prescribed Sonata and progesterone for Plaintiff's insomnia (R. 635).

Plaintiff received chiropractic treatment on April 24, May 15 and 29, and June 26, 2002 (R. 616, 618).

On June 26, 2002, Plaintiff presented to Dr. Pallie for a routine follow-up examination. Dr. Pallie noted Plaintiff's pain was being helped "a lot" with Celebrex. She was able to cut back on her

27

chiropractic visits to once every three weeks. She said her neck pain had improved and she had been sleeping better at night. She did not experience palpitations. Plaintiff told Dr. Pallie, however, she had "subjective edema in her hands and feet." She informed Dr. Pallie she could not work as she had attempted to do house cleaning at a person's apartment and experienced "acute horrible pain for several days after that." Dr. Pallie's assessment was for chronic pain, anxiety and palpitations. Dr. Pallie switched Plaintiff from Celebrex to Bextra, which she hoped would diminish Plaintiff's subjective edema. She prescribed Prometrium every other day for anxiety and palpitations (R. 634)

Plaintiff received chiropractic treatments on July 10, July 26, August 15, and September 3, 2002 (R. 615-16).

In a letter to Workers' Compensation dated October 6, 2002, Dr. Pallie wrote requesting reconsideration of the denial of Plaintiff's chiropractic coverage and authorization of payment for, "at the very least," monthly chiropractic treatments (R. 633).

On February 11, 2003, Dr. Pallie wrote that Plaintiff's condition prevented her from performing gainful employment as her mobility, strength, and coordination were limited. She then opined Plaintiff "deserved" SSI Disability because she had attempted "without success various modalities of therapeutics and there [were] no medical options left to improve her condition to a point where she could conceivably support herself through any type of work" (R. 632).

On February 20, 2003, ALJ Steven Slahta conducted an administrative hearing, at which Plaintiff and her counsel appeared (R. 143-82). Plaintiff testified she supervised rental property for her father, who resided in Florida. She was responsible for maintaining the fuel oil supply at the apartments and finding new tenants when a property became vacant, which required "a couple hours" of her time per month (R. 148). She drove a car approximately seventy miles per week (R. 149).

Plaintiff testified she attempted to do light housecleaning as a form of employment "sometime around 2000" for two days per week (R. 153). Plaintiff stated she began work at 9:00 a.m. or 10:00 a.m. and would cease work by mid-afternoon because she had to "stop and rest periodically." She would work fifteen to twenty minutes, "then stop and lie down for 15 to 20 minutes." She did not wash windows or move furniture, but vacuumed with a canister vacuum and dusted with a feather duster (R. 154-55). She estimated she spent between two and three hours cleaning one house. She stated she had a "window of opportunity in the morning" in which she could be more active (R. 155). Plaintiff testified she stopped cleaning houses for others in December because her pain was "worse in the winter" (R. 156).

Plaintiff stated her activities of daily living included doing dishes every two or three days and doing light housework. She testified she had wood to heat her home delivered and her "son or somebody" stacked it in the woodshed (R. 156).

Plaintiff testified she experienced shooting pains that went down her arms and into her hands and did not have much grip strength. Gripping objects caused shooting pain down her arm and through her elbow (R. 157). Plaintiff described her pain as follows:

> On a typical day that I would consider a good day, I would get up in the morning with pain levels around two or three, and as the day increases – as the day goes on, the pain increases. And that part is pretty predictable. By early to mid-afternoon, the pain levels will be five to six, you know, and then if I continue to try to be active, they will increase more to seven. Seven or so and so in my mind, my functional ability kind of cuts off at level five. If I have pain levels under five, I could probably be up puttering around my house. With pain levels five and over, I'm lying down. With pain levels eight or more, I need assistance to get through the day.

(R. 158-59). Plaintiff testified that when she looked down "for more than a couple of minutes," she started "to have muscles [sic] spasms in the back" of her neck and into her shoulder muscles, and when she looked down for a longer period of time, she experienced shooting pains down one or the

other arm (R. 162-63). She testified that "[j]ust about the same thing" happened to her when she looked up (R. 163). She could stand in one spot without moving around for only five to ten minutes and walk for up to thirty minutes (R. 163-64). Plaintiff testified she felt "depressed a lot" and was taking 1,200 mg daily of St. John's Wart for depression (R. 165). Plaintiff stated she had difficulty sleeping in that she could "fall asleep for the first couple hours" and then awakened and was uncomfortable. She estimated she slept for a total of five hours per night, which was interrupted by wakefulness (R. 166-67). She stated her depression affected her relationships with others as she did not want to answer the phone and felt anxious. She described difficulty concentrating as "[s]ome days it's not too bad, and some days I can't concentrate at all." She stated her concentration levels were affected by depression, lack of sleep, and pain (R. 167). Plaintiff testified she could lift a gallon of milk on a good day but not on a bad day (R. 176).

Plaintiff testified that in response to taking so many medications prior to 1994, she had conducted research on alternative medicines, and "started prescribing the stuff for myself," specifically, herbal medications, ice packs, and traction. She did not wear a brace, walk with a cane, or use a nerve stimulator (R. 174). Chiropractic treatments helped. She affirmed she had never been referred to a psychologist, psychiatrist, or counselor for mental health care, but had gone to a psychologist "last spring" on two occasions, which involved learning breathing and relaxation exercises (R. 175-76).

At the administrative hearing, the ALJ asked the VE the following hypothetical questions:

Please assume a younger individual with a high school education precluded from performing all but sedentary work with a sit/stand option. No repetitive overhead reaching. No hazards such as dangerous and moving machinery. Unprotected heights. No repetitive bending. No climbing. Finally, low-stress, unskilled work. One and two step – which is defined as one and two step processes, routine, and repetitive tasks. Primarily working with things rather than people. Entry level. With

those limitations, can you describe any work this hypothetical individual can perform? (R. 179).

The VE responded:

A dispatcher, national numbers are 272,000. Regional levels are 2,900. Security surveillance monitor. National numbers are 97,000. Regional numbers are 1,900. Charge account clerk, 225,000 nationally, 4,500 regionally (R. 179).

The ALJ then inquired:

What – much of [Plaintiff's] testimony regarding difficulty looking down, those jobs or any other jobs you can name under any other sort of hypothetical or any combination of limitations, but it – but all jobs require looking down. Does it vary? (R. 179-80).

The VE answered:

It varies, Your Honor. Some jobs, for instance, like the jobs that were mentioned, I would say that occasionally the individual would have to look down (R.180).

The ALJ then asked the following hypothetical:

The second hypothetical would be that more in the form of a question. If [Plaintiff] were to miss two days of work due to bad days – or more a month, is that a tolerable limit of absenteeism? (R. 180).

The VE replied to that questions as follows:

Usually if an individual misses up to two days, it's tolerable. If they miss over three days, it's not tolerable, Your Honor (R. 180).

The ALJ asked:

Third question, if the claimant's concentration was impacted 1/3rd [sic] to 2/3rds [sic] of the day, where she couldn't stay on task or those jobs you named in hypothetical one, impact it? (R. 180).

The VE answered:

If the individual could not stay on task for that amount of time, Your Honor, those jobs would not be available (R. 180).

On March 17, 2003, Plaintiff's counsel wrote to Dr. Riggs, detailing her assessments of Plaintiff's physical condition and Plaintiff's complaints (R. 24-25). She asked Dr. Riggs if he could "speak to the reasonableness of Ms. Sparks [sic] allegations of intermittent severe pain and the manner in which she claims functional limitation as described above." Additionally, she informed Dr. Riggs that she had asserted that Plaintiff's medical condition was "at least medically equivalent in severity, if not an absolute match with, the condition of disability as described in Pt. 404, Subpt. P. App.1, Paragraph 1.04" (a copy of which she provided to Dr. Riggs) and asked Dr. Riggs if Plaintiff's "condition [met] the criteria set forth in 1.04 A, B, or C" or if her condition was "similar in severity if not described exactly in 1.04 A, B., or C" (R. 26).

Also on March 17, 2003, Dr. Riggs corresponded with Dr. Pallie, noting that he had conducted a neurologic examination of Plaintiff on that date. He wrote that Plaintiff's pre-surgery 1991 MRI showed severe degenerative arthritis with disc herniations at C5-C6 and C4-C5 levels. Dr. Riggs informed Dr. Pallie that his examination of Plaintiff revealed "diffusely decreased reflexes." His impression was for "chronic neck pain with severe degenerative arthritis and degenerative disk disease." Dr. Riggs suggested a repeat MRI to aid in identifying any surgical disease, as well as obtaining a functional capacity evaluation (R. 17).

On April 14, 2003, Shiv Navada, M.D., performed a consultative examination of Plaintiff at the ALJ's request (R. 655). He noted Plaintiff stated she had "some dull pain," which she rated at five out of ten. Plaintiff's medications were Bextra, Tylenol, Tylenol PM, St. John's Wort, and other herbal medications. According to Dr. Navada's assessment, Plaintiff was alert and oriented in all spheres. Her attention, concentration, language function, and fund of knowledge were all normal (R. 650). Her sensation and strength were normal. She presented with no atrophy, normal

tone, and normal strength in her lower extremities. She exhibited "give away weakness of handgrip, biceps . . . [and] shoulder abductors bilaterally." Dr. Nevada noted all Plaintiff's modalities were intact. Plaintiff could "walk on her toes as well as on her heels" and could "tandem walk and perform a knee bend."

Dr. Nevada observed Plaintiff's cervical scar and noted her neck flexion was twenty degrees, extension was twenty-five degrees, lateral tilt was twenty degrees, and rotation was seventy degrees. Plaintiff's neck movements were dysrhythmic, her lumbar movements were full, and straight leg raising was negative. Dr. Nevada reviewed Plaintiff's EMG and opined it was normal. He also reviewed the pre-surgery 1991 MRI, which showed disc herniation at C5-C6 and C4-C5. Dr. Nevada's impression was for status post cervical fusion at C5-C6 and cervical spondylosis. He noted Plaintiff had persistent neck pain and subjective weakness of her arms and some episodic paresthesias and opined her symptoms fluctuated (R. 522). He also expressed doubt that Plaintiff's symptoms would normalize. He was unable to complete the Ability to do Work-Related Activities form, as Plaintiff was subjectively unable to perform "even at the lowest level in most of the categories." Finally, Dr. Nevada opined Plaintiff's "neurologic exam was exceptionally normal except for give away weakness as documented above" (R. 652).

On May 18, 2003, the ALJ issued a decision finding Plaintiff was not disabled (R. 34-48).

**Post-Decision Evidence Submitted to the Appeals Council**

On June 4, 2003, Plaintiff underwent a cervical MRI. It was interpreted by Dr. Jeff Carpenter, who also compared it to Plaintiff's September 14, 2001, MRI. His impression was as follows:

1) Focal kyphosis centered at the C5-6 intervertebral disk space level with left central disk herniation of the protrusion type with a probable osteophyte

33

component. Additionally, there is equivocal enhancement within the intervening disk at this level anteriorly. The pattern does not suggest a diskitis or osteomyelitis, but rather inflammatory changes due to degenerative changes. There is loss of height anteriorly of the C6 vertebral body that was present on the prior study as well. There are facet degenerative changes most prominent at the C4-5 level with moderate to severe right neural foraminal stenosis (R. 20-21).

2) Spinal canal stenosis (predominantly on a congenital basis) extending from C3-4 through the C5-6 intervertebral disk space level. No cord signal abnormality is appreciated, however (R. 21).

On June 16, 2003, Dr. Riggs corresponded with Plaintiff's counsel relative to the "specific questions" asked by counsel in her March 17, 2003, letter to him. Dr. Riggs noted Plaintiff's recent Functional Capacities Evaluation was "somewhat non-definitive due to pain." He opined her EMG studies were normal. Her MRI studies indicated "evidence of severe degenerative arthritis with disk herniations at the C5-C6 and C4-C5 levels," which were "associated with mass effect and some neural foraminal narrowing." Dr. Riggs noted Plaintiff had decreased reflexes at the right biceps and give away weakness on the right arm secondary to pain. He opined, "[g]iven her medical findings," it was reasonable that Plaintiff would experience "chronic neck pain with episodic worsening of the pain and weakness of the upper extremities." He further opined that Plaintiff's assertion that she could not look up or down was consistent with her severe degenerative arthritis superimposed upon congenital cervical stenosis. He noted that counsel's description of Plaintiff's pain in her March 17, 2003, letter to him was reasonable (R. 22). Dr. Riggs wrote he agreed that Plaintiff "would experience pain that interfere[d] with her concentration such that she would be off task 3 or more days per month, or that she would not be able to perform well at least one to two hours per eight hour work day." He also noted "[i]t [was] not incompatible to have a grossly normal EMG and to still experience severe pain" (R. 22-23). Dr. Riggs "reviewed Social Security regulation 1.04" as

34

provided by Plaintiff's counsel, and opined Plaintiff had "a disorder of the spine including spinal stenosis, disc herniations, and degenerative disc disease that [did] cause compression on the right C4-C5 nerve root and is consistent with [Plaintiff's] symptoms of neck, arm, and hand pain and weakness as specified in 1.04A" (R. 23).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings in the May 18, 2003, decision:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through September 30, 1997.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has residuals, status post anterior cervical discectomy and fusion at C5-C6, disc herniation at C4-C5 and C5-C6, and depressive disorder, impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7. Since September 1, 1992, the claimant has had the following residual functional capacity: she is able to perform the demands of sedentary work with certain modifications. She must be allowed to sit or stand at will during the workday. She is unable to perform jobs requiring repetitive overhead reaching or bending and must avoid exposure to hazards, such as dangerous or moving machinery or unprotected heights. She is limited to unskilled, low stress, entry-level work that involves one-

to two-step work processes and routine, repetitive tasks, primarily working with things rather than people.

8. The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

9. The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

10. The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

11. The claimant has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

12. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 416.967).

13. Although the claimant's limitations present since September 1, 1992, do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.23 and 201.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as dispatcher, security surveillance monitor, and charge account clerk.

14. The claimant has not been under a "disability," as defined in the Social Security Act, at any time since September 1, 1992 (20 CFR §§ 404.1520(f) and 416.920(f)) (R. 46-47).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less

than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff states the issues as follows:

1.  Whether the Commissioner properly weighed the evidence of record in assessing and determining the residual functional capacity of the Plaintiff?

    a.  Whether the Administrative Law Judge sought evidence from/or the opinion of a consultative neurologist instead of first seeking the evidence or opinion from the treating sources pursuant to § 416.912(e) and SSR 96-5p?

    b.  Whether the Administrative Law Judge improperly speculated regarding the claimant's residual functional capacity and credibility in ways that were inconsistent with competent treating medical health professionals and the substantial evidence of record?

2.  Whether the Commissioner met his burden of proof at the fifth step of the sequential evaluation?

3.  Whether the new evidence presented to the Appeals Council must be considered? And

4.  Has the Commissioner required an impermissible level of proof of claimant's subjective complaints of pain?

Defendant contends:

1.  The Medical Evidence Supports the ALJ's Conclusion that Plaintiff Could Perform a restricted range of sedentary work;

2.  The ALJ properly concluded that Plaintiff's subjective symptoms were not entirely credible.

3.      The limitations the ALJ included in the hypothetical question posed to the VE are supported by the record;

4.      The evidence submitted to the Appeals Council is not "new" and "material;" and

5.      The Commissioner met her burden at step five of the sequential evaluation process.

### C. RFC

Plaintiff's first questions whether the Commissioner properly weighed the evidence of record in assessing and determining the residual functional capacity of the Plaintiff. As framed, this issue consists of several contentions:

a.      Whether the Administrative Law Judge sought evidence from/or the opinion of a consultative neurologist instead of first seeking the evidence or opinion from the treating sources pursuant to §416.912(e) and SSR 96-5p? And

b.      Whether the Administrative Law Judge improperly speculated regarding the claimant's residual functional capacity and credibility in ways that were inconsistent with competent treating medical health professionals and the substantial evidence of record?

Defendant contends the Medical Evidence Supports the ALJ's Conclusion that Plaintiff Could Perform a restricted range of sedentary work.

Plaintiff first cites 416.012(e) and SSR 96-5p in support of her argument that the ALJ improperly sought evidence from a consultative neurologist instead of first seeking the evidence or opinion from the treating sources. She refers in particular to neurologist Dr. Riggs and Plaintiff's family doctor Erika Pallie. The administrative hearing was held on February 20, 2003. Plaintiff had last seen a neurologist, Dr. Riggs, on February 18, 2002, a year earlier. Further, Dr. Riggs had only examined Plaintiff on that one occasion. He interpreted her 2001 MRI, examined her, and took her medical history. He then opined that it would be worthwhile to obtain EMG studies, "looking for

any additional evidence of right cervical radiculopathy or anything else that might be contributing to her right arm symptoms, such as carpal tunnel syndrome." He also opined she should have a neurosurgical evaluation. Considering that: 1) Dr. Pallie is a family doctor and not a neurologist; 2) neurologist Dr. Riggs saw Plaintiff only once for an examination; 2) that examination took place a year before the administrative hearing; and 3) Dr. Riggs' opinion was generally only that Plaintiff should get more tests, the undersigned finds the ALJ's action in sending Plaintiff to a neurologist for a consultative examination after the hearing was appropriate. First, Dr. Riggs was not, at least at the time, a treating physician, but had only examined Plaintiff once at the request of her chiropractor. Second, his evaluation occurred a year before the hearing. Third, Dr. Pallie, who was a treating physician at the time, is not a neurologist.

As to Plaintiff's argument concerning Dr. Riggs' evaluation of March 17, 2003, that report was submitted after the ALJ's decision, to the Appeals Council. The ALJ therefore could not have considered that evaluation. The undersigned will discuss Dr. Riggs' March 17, 2003, and subsequent reports later in this Opinion, under the heading "Evidence Submitted to Appeals Council."

Plaintiff next argues the ALJ improperly speculated regarding her residual functional capacity and credibility in ways that were inconsistent with competent treating medical health professionals and the substantial evidence of record. The undersigned will discuss the ALJ's RFC here and his Credibility Analysis below.

The ALJ determined Plaintiff had the severe impairments of residuals, status post anterior cervical diskectomy and fusion at C5-6, disc herniation at C4-5 and C5-6, and depressive disorder. Step four of the sequential evaluation requires the ALJ to determine if a claimant has the ability to do past work. In order to do so, the ALJ must first make a determination of the claimant's Residual

39

Functional Capacity ("RFC"), which means the most the claimant can do after considering the effects of the mental and physical limitations that affect her ability to perform work-related tasks. 20 C.F.R. §§ 404.1545 and 416.945.

The ALJ determined Plaintiff could not do her past relevant work, but retained the residual functional capacity to perform sedentary work with the option to sit or stand at will during the workday, with no overhead reaching or bending, no exposure to hazards, performing unskilled, low stress, entry-level work involving one-to-two step work processes and routine, repetitive tasks, primarily working with things rather than people.

An ALJ decision of January 1993, awarded Plaintiff a closed period of disability until June 30, 1992. This decision is considered a final decision and cannot be revisited. Therefore, the undersigned will consider the evidence submitted subsequent to that date.

In March 1993, Plaintiff told an examining physician she had neck pain on the left with pain radiating to her shoulder, left arm pain and weakness, tingling in her left index finger and thumb, and headaches. She also stated these "problems" were mild but constant. The doctor noted good fusion of the C5-6 vertebrae without significant subluxation. He diagnosed residual mechanical neck pain status post cervical fusion, residual mild left upper extremity weakness secondary to disc herniation, and cubital tunnel syndrome.

Two months later, Plaintiff had a much improved range of motion of her cervical spine. She refused another myelogram, declined the use of a cast for treatment of the possible cubital nerve entrapment, and declined further x-rays. Still her doctor opined she had improved a great deal, and suffered a 15 % whole body physical impairment.

An orthopedic examination in November 1993 was essentially within normal limits. There

was no limitation of motion of the shoulder, elbow, forearm, wrist or hands. There was no sensory change or muscle weakness. Plaintiff had good hand grip bilaterally and reflexes were symmetrical and active. The orthopedic specialist opined no further treatment would be needed and the agreed Plaintiff had a permanent partial impairment of 15%.

At an October 1995 examination, Plaintiff stated she took no medications for pain, instead drinking up to four glasses of wine per day. Upon examination she was comfortable sitting, standing, and supine. Extremities appeared normal with no swelling, tenderness, redness or warmth She exhibited only "some mild tenderness" in the trapezius area of the cervical spine and complained of pain with extension and flexion. Her left elbow had normal range of motion. She was neurologically grossly intact with no focal deficits, and motor strength and reflexes were equal bilaterally. A State agency physician opined Plaintiff could work at the light exertional level.

At a January 1996, orthopedic examination, Plaintiff again stated she took no prescription medications. Examination showed discomfort on cervical range of motion, decrease range of motion, no muscular atrophy, normal range of motion in fingers and wrists, and equal right and left arm circumference. Her left extremity reflexes were very difficult to test due to complaints of pain. She had poor muscular effort in the left upper extremity due to subjective complaints of pain, and not atrophy. The doctor diagnosed status post cervical disc herniation at C5-6 post fusion, with continued cervical pain and left radicular symptoms. He recommended an MRI and agreed Plaintiff's impairment was 15%. He recommended further evaluation by a neurosurgeon and opined that chiropractic treatment would not be of any long term benefit.

A September 2001, MRI (three years after the 1998 ALJ decision and two years after the Magistrate's Recommendation) indicated disk herniations at C5-6 and C4-5 on the left, with mass

effect on the medial portion of the left neural foramen at each level, superimposed on a congenitally diminutive central spinal canal. The doctor reading the MRI opined that correlation for the presence or absence of a left C5 or C6 radiculopathy might be helpful. Plaintiff apparently continued to treat only with a chiropractor through 2001.

Neurologist Riggs' February 2002, examination indicated "some decreased reflexes" at the right biceps and "give away weakness on the right arm secondary to pain." He recommended an EMG to determined the cause of her symptoms and a neurosurgical evaluation.

Plaintiff finally went to a medical doctor for evaluation in March 2002, to "establish a primary care provider." [2] Plaintiff told Dr. Pallie she had "some trouble maintaining her activities of daily living." Dr. Pallie noted Plaintiff lived alone with two dogs and three cats, and had spring water and a wood stove. She also reported no history of no alcohol use. She said she had wood heat and needed to be able to split wood, carry water, do her dishes, and vacuum, all which were very difficult to do "when her pain is up." She said she had "trouble looking down" and had dropped things. She was capable of bathing herself and cooking. She had tried and stopped a variety of medications due to side effects ranging from vomiting, to depression, to anorgasmia. Celebrex, however, helped. Chiropractic and massage therapy helped her to tolerate her discomfort but she still had trouble sleeping.

Upon examination, Plaintiff's neck was very stiff with decreased flexion and rotation, with a lot of tenderness in the paraspinal muscles, along her spine, in her right shoulder and in the latisimus. She had full range of motion of all extremities, with no clubbing, cyanosis, or edema. She had decreased strength in her right hand and reflexes were difficult to elicit.

---

[2]As noted in the Statement of Facts, Plaintiff treated with chiropractic, up to four times per week.

42

Based on this one-time examination (at the time), Dr. Pallie opined that Plaintiff was "completely incapable of working to support herself." She opined she "clearly" could not do office work, could not work at a computer without exacerbating her physical complaints, and could not do any kind of manual labor.

On follow-up with Dr. Pallie in April 2002, the doctor noted Plaintiff's EMG was normal. Celebrex helped her a lot, keeping her pain down to a three. She was not having any side effects from it. She had a lot of tenderness in her neck, paraspinal muscles, rhomboids, and trapezius, and still "seem[ed] to have" (right) muscle weakness in her hands. She was diagnosed with neck pain with arm pain, and insomnia secondary to pain. Dr. Pallie continued the Celebrex and prescribed Sonata for sleep. By June 2002, Plaintiff reported the Celebrex was helping "a lot." She was cutting back her chiropractic visits to once every three weeks. She noted "developing some sensation of swelling in her lower abdomen," and "subjective edema in her hands and feet" and wondered if it could be due to the Celebrex. Her neck pain had been better and she was sleeping better at night. She said she could not really work, stating she had tried to clean an apartment for pay and was in acute horrible pain for several days after that. Upon examination, her neck was very tender to palpation and there was decreased range of motion. Her abdomen was soft and nontender. Her extremities had no clubbing, cyanosis, or edema, despite her subjective report of edema. Dr. Pallie diagnosed chronic pain and changed her from Celebrex to Bextra in case the edema Plaintiff reported might be due to the Celebrex. Dr. Pallie instructed Plaintiff to call and tell her if that worked.

These were the only examinations in the record by Dr. Pallie before she wrote a letter in February 2003, stating Plaintiff had a diagnosis of herniated disc of C4-5 and C5-6, cervical spine osteoarthritis, and nerve impingement involving both arms, hands and head, that limited her

43

mobility, strength and coordination, and prevented her from doing gainful employment.

This is also the entire record of treating and examining acceptable medical sources regarding Plaintiff's physical impairments before the ALJ at the time of his decision.

As the ALJ properly noted, controlling weight could not be accorded Dr. Pallie's opinion that Plaintiff "could not work" or was disabled, as that is an issue reserved to the Commissioner. SSR 96-5p states:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is 'disabled' or 'unable to work,' or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

(Emphasis added.) The ALJ also correctly noted the only evidence of actual examination or treatment by Dr. Pallie was from March 2002 through June 2002. As of her last examination, Plaintiff reported getting "a lot" of help from Celebrex, her pain was generally only a three on a scale of one to ten, and she could sleep. Plaintiff complained of some "subjective edema," however, and Dr. Pallie changed her from Celebrex to Bextra, despite finding no edema upon examination. She specifically advised Plaintiff to contact her if the change did not help. There is no indication in the record that Plaintiff ever did so. This documentation is all inconsistent with Dr. Pallie's later letters stating that Plaintiff was disabled from all work. Additionally, the fact that Plaintiff had tried to clean an apartment and suffered pain afterward, is not inconsistent with the ALJ's finding that she could do sedentary work. Finally, Plaintiff's own statements to Dr. Pallie, that she lived alone and

needed to be able to split wood and carry water as she had only spring water and a wood stove, are also not inconsistent with the ALJ's determination that she could do sedentary work.

The undersigned therefore finds substantial evidence supports the ALJ's according Dr. Pallie's opinion that Plaintiff could not work or was disabled no weight. It also supports his determination that her 2003 opinion was otherwise not supported by, and was inconsistent with her own findings, other findings by examining and non-examining physicians, and the neurological findings. Additionally, Dr. Pallie is a family practitioner, not a specialist, and the ALJ's finding that her opinion regarding Plaintiff's ability to work was based primarily on Plaintiff's subjective complaints is substantially supported by the record.

As to Dr. Riggs, as already noted, Dr. Riggs had only examined Plaintiff on one occasion prior to the administrative hearing. He really did not make any diagnosis at that time, except to recommend further tests. The recommended EMG was normal.

As regards Plaintiff's arguments concerning Dr. Riggs' March 17, 2003, and subsequent evaluations, again the undersigned notes these were submitted to the Appeals Council after the ALJ's decision, and therefore could not have been considered by the ALJ. The undersigned will discuss Dr. Riggs' opinion under the heading "Evidence Submitted to Appeals Council."

The undersigned therefore finds the ALJ's RFC is not "inconsistent with competent treating medical health professionals and the substantial evidence of record.," and further, that it is supported by substantial evidence in the record.

### D. Pain and Credibility

Plaintiff also argues that ALJ improperly speculated regarding her credibility in ways that were inconsistent with competent treating medical health professionals and the substantial evidence

of record, and also argues the Commissioner required an impermissible level of proof of claimant's subjective complaints of pain. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594. The ALJ here determined that Plaintiff met the first step. He was therefore required to evaluate the intensity and persistence of her pain and the extent to which it affected her ability to work.

The ALJ's decision shows he took into account Plaintiff's statements about her pain, her description of the pain, her medical history, medical signs and laboratory findings, objective medical evidence of pain (or lack thereof), the treatment she sought (and did not seek) to alleviate it, and her daily activities.

It was proper for the ALJ to consider Plaintiff's report to Dr. Palllie that she lived in a rural area by herself and needed to be able to split wood, carry water, do dishes, and vacuum. It was proper for the ALJ to consider that Plaintiff obtained a great deal of relief from Celebrex, bringing her pain down to a level of three out of ten. It was appropriate for him to consider Plaintiff's non-use of medications and her failure to follow through with tests recommended by physicians. Although Dr. Pallie switched her from the Celebrex to another medication after Plaintiff complained of "subjective edema," there is no further report to indicate that the new medication did not work as well as the Celebrex had– Dr. Pallie had expressly told Plaintiff to contact her if it did not work. There is a notable lack of any medical evaluation or treatment from 1993 until 2002, except for chiropractic treatment, which orthopedic specialist Thrush opined would not help in the long term.

Finally, Plaintiff's arguments regarding Dr. Riggs' opinion that Plaintiff's reported pain and limitations were credible must once again be reserved to the discussion of the evidence submitted to the Appeals Council as that opinion was not before the ALJ and he therefore could not possibly have considered it.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984). The undersigned therefore finds substantial evidence supports the ALJ's credibility determination.

## E. Fifth Step

Plaintiff frames her next argument as: Whether the Commissioner met his burden of proof at the fifth step of the sequential evaluation? Defendant contends the Commissioner met her burden at step five of the sequential evaluation process. At the fifth step of the sequential evaluation, the ALJ must determine if work exists in significant numbers in the national economy that accommodates Plaintiff's residual functional capacity and vocational factors.

The ALJ first asked the VE to consider a younger individual with a high school education precluded from performing all but sedentary work with a sit/stand option. There could be no repetitive overhead reaching, no hazards, no repetitive bending, and no climbing. The work must be entry-level, low-stress, unskilled work, involving one and two step processes, and routine and repetitive tasks. She must work primarily with things, rather than people.

The VE named the jobs of dispatcher, security surveillance monitor, and charge account clerk. The ALJ asked the VE if those jobs were consistent with their descriptions in the Dictionary of Occupational Titles, and the VE replied that they were. He also testified that the jobs he mentioned would occasionally require the individual to look down. When asked the VE defined occasional as "it may be as much as 1/3rd of the time," but also "could be less than that." The VE also testified that the individual could miss up to two days per month, but more than three days per month actual absenteeism would not be tolerable.

Plaintiff argues she "was advised to work no greater than 20 hours per week prior to her surgery; the surgery proved not to be helpful in the long run in that the pain and disability continue to plague her; and she was advised not to perform the tasks that aggravate her condition." (Plaintiff's "Additional and Supplemental Memorandum" at 11.) The undersigned finds the limitations on

Plaintiff prior to her surgery are not relevant to the time period at issue. The ALJ did not find that Plaintiff had <u>no</u> pain and limitations since her surgery – he found she did have pain that limited her to less than a full range of sedentary work.

Plaintiff next argues: "The VE listed dispatcher, which is not one of the 137 jobs to which the Commissioner takes judicial notice as being jobs available for less than sedentary work. . . . The VE listed a charge account clerk, which the DOT describes at 205.367-014 as working a great deal with people, one of the factors that the ALJ cautioned against in his hypothetical; and the VE listed a security surveillance monitor which the DOT describes at 379.367-101 as being remarkably similar to the kind of job all medical and vocational personnel have agreed that Plaintiff Sparks should not perform – working at a computer monitor."

SSR 96-9p provides, in pertinent part:

> When there is a reduction in an individual's exertional or nonexertional capacity so that he or she is unable to perform substantially all of the occupations administratively noticed in Table No. 1, the individual will be unable to perform the full range of sedentary work: the occupational base will be "eroded" by the additional limitations or restrictions. However, the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability. There may be a number of occupations from the approximately 200 occupations administratively noticed, and jobs that exist in significant numbers, that an individual may still be able to perform even with a sedentary occupational base that has been eroded.
>
> . . . .
>
> When the extent of erosion of the unskilled sedentary occupational base is not clear, the adjudicator may consult various authoritative written resources, such as the DOT, the SCO, the Occupational Outlook Handbook, or County Business Patterns.
>
> <u>In more complex cases, the adjudicator may use the resources of a vocational specialist or vocational expert. The vocational resource may be asked to provide any or all of the following</u>: An analysis of the impact of the RFC upon the full range of sedentary work, which the adjudicator may consider in determining the extent of the erosion of the occupational base, <u>examples of occupations the individual may be able to perform, and citations of the existence and number of jobs in such occupations in the national economy.</u>

(Emphasis added). The ALJ here did retain and question a VE to provide "examples of occupations [Plaintiff] may be able to perform, and citations of the existence and number of jobs in such occupations in the national economy." The VE named three jobs, any one of which he testified was available in significant numbers in the regional and national economy. The Grids provide guidance where there are generally only exertional limitations. Where that is the case, the Commissioner has taken administrative notice that there are a substantial number of occupations in the national economy available to an individual who meets all the factors of each table. The ALJ here did not rely on the Grids, instead calling a VE to testify, which was proper, his having found Plaintiff had non-exertional as well as exertional limitations.

In addition, SSR 00-4p, provides, in pertinent part:

When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:

Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and

If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

The ALJ here did inquire of the VE whether the evidence he provided conflicted with the DOT. The VE responded that it did not. SSR 00-4p also provides:

Evidence from VEs or VSs can include information not listed in the DOT. The DOT contains information about most, but not all, occupations. The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term "occupation," as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs. Information about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career

counseling.

The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.

In Koonce v. Apfel, 166 F.3d 1209 (4th Cir 1999), the Fourth Circuit held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. See also Lee v. Sullivan, 945 F.2d 689 (4th Cir. 1991)(noting that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record."). Although Dr. Riggs opined that Plaintiff's description of being unable to look down for long periods of time was consistent with her impairment, again that opinion was submitted to the Appeals Council and was not before the ALJ. Further, the VE testified that the jobs he named would entail looking down occasionally, not for "long periods of time." Substantial evidence supports the ALJ's determination that Plaintiff could look down at least occasionally, if only based on her own statements regarding her daily activities including cooking, washing dishes, dusting, driving a car, cleaning the floors, and doing light housekeeping. In addition, the evidence before the ALJ substantially supports his determination that Plaintiff would not miss more than three days per month or be off task from 1/3 to 2/3 of a day.

The undersigned therefore finds the ALJ asked the VE a hypothetical that included all of Plaintiff's limitations that were supported by the evidence at the time. The undersigned also finds that substantial evidence supports the ALJ's reliance on the VE's response to that hypothetical, and his conclusion that there were a significant number of jobs available in the national economy that Plaintiff could perform.

51

## F. Evidence Submitted for the First Time to the Appeals Council

Plaintiff also argues that the new evidence presented to the Appeals Council must be considered. Defendant contends the evidence submitted by Plaintiff to the Appeals Council was neither new or material, and therefore did not require remand. Pursuant to 20 CFR § 404.970(b), the Appeals Council shall consider evidence submitted with a request for review if the evidence is new, material, and relates to the period on or before the dates of the ALJ's decision. Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. Wilkins v. Secretary, Dept. of Health and Human Services, 953 F.2d 93, 96 (4th Cir. 1991). Evidence is not "new" if other evidence specifically addresses the issue. See Id. at 96.

In its decision of June 19, 2004, the Appeals Council stated that it considered additional evidence consisting of Plaintiff's affidavit, letters from Dr. Riggs dated March 17, 2003, and June 16, 2003, and a 2003 MRI. The Appeals Council then stated the new evidence did not support a basis for changing the ALJ's decision. The Appeals Council included the evidence in the transcript. The undersigned finds that the Appeals Council did consider the evidence. The Fourth Circuit holds that the Court may consider evidence that was submitted for the first time to the Appeals Council. Wilkins, supra.

The undersigned does not find Plaintiff's affidavit, the first letter from Dr. Riggs or the letter from counsel to Dr. Riggs material, because none, either singly or in combination with the other evidence, would reasonably have changed the ALJ's determination. Having found Plaintiff not entirely credible, it is unlikely Plaintiff's own statements regarding her limitations would have changed the ALJ's determination. The first letter from Dr. Riggs to Dr. Pallie is both cumulative and not material. It states that Plaintiff's 1991 MRI showed severe degenerative arthritis with disk herniations at the C5-6 and C4-5 levels, associated with mass effect and that on examination Plaintiff

had diffusely decreased reflexes. All this information was before the ALJ at the time of his decision. Dr. Riggs diagnosed Plaintiff with "chronic neck pain with severe degenerative arthritis and degenerative disk disease." This information is also not "new." Finally, Dr. Riggs opined: "I think it would be appropriate to go ahead and repeat the MRI at this point, looking for any evidence of surgical disease as well as obtaining a functional capacity evaluation." The undersigned finds none of this evidence reasonably would have changed the ALJ's determination. Next, the letter from counsel to Dr. Riggs merely sets out Plaintiff's own subjective complaints and asks Dr. Riggs to opine whether these complaints were consistent with the objective medical evidence. This sets the groundwork for Dr. Riggs' response, but is not evidence in and of itself.

The two items remaining are the June 4, 2003, MRI and Dr. Riggs' letter dated June 16, 2003, responding to counsel's request for an opinion regarding the reasonableness of Plaintiff's complaints of pain and limitation. The undersigned finds these two pieces of evidence are new, in that they did not exist at the time of the ALJ's decision. The undersigned also finds they relate to the period on or before the date of the ALJ's decision, in that the decision was rendered on May 18, 2003, and the MRI and letter were dated within a month of that decision. Although the evidence is in part cumulative, the undersigned will nevertheless consider whether there is a reasonable possibility it would have changed the ALJ's decision.

The ALJ had before him a 2001 MRI indicating:

Disk herniations are identified at the C5-C6 and C4-C5 levels on the left with mass effect on the medial portion of the left neural foramen at each of these two levels. Correlation for the presence or absence of a left C5 or C6 radiculopathy may be helpful with regard to these observations. These findings are superimposed on a congenitally diminutive central spinal canal with relatively little preserved subarachnoid space dorsal and ventral to the spinal cord. Degenerative endplate change with loss of disk height is noted at the C5-C6 level.

Nearly a month after the administrative hearing, Plaintiff's counsel wrote to Dr. Riggs, noting

53

that the ALJ had scheduled Plaintiff for a consultative neurological examination, and asking if Dr.

Riggs would address the reasonableness of Plaintiff's symptoms. Dr. Riggs first noted that: 1)

Plaintiff's MRI's showed severe degenerative arthritis with disk herniations at the C5-C6 and C4-C5

levels associated with mass effect and some neural foraminal narrowing; 2) two EMG's were

essentially normal; 3) a functional capacities evaluation was "somewhat non-definitive due to pain;"

and 4) Plaintiff had decreased reflexes at the right biceps and give away weakness on the right arm

secondary to pain. Based on specific symptoms and limitations alleged by Plaintiff, Dr. Riggs

wrote:

> Given her medical findings, it is reasonable to expect that Ms. Sparks would experience chronic neck pain with episodic worsening of the pain and weakness of the upper extremities.

> Ms. Sparks' description of not being able to look up or down for long periods of time is entirely consistent with her severe degenerative arthritis superimposed upon congenital cervical stenosis. Patients with these conditions may complain that their neck does not feel as if it can support their heads. It is not surprising that she often wants to recline in order to take pressure off of her neck.

> While I can not tell you precisely how severely Ms. Sparks experiences pain, or at what times she experiences pain, it is reasonable to believe her complaints as you describe them in your March 17, 2003 letter to me given the MRI findings.

> Specifically, I would agree that Ms. Sparks would experience pain that interferes with her concentration such that she would be "off task" 3 or more days per months, or that she would not be able to perform well at least one to two hours per eight hour work day.

> It is not incompatable [sic] to have a grossly normal EMG and still experience severe pain.

> Give-away weakness is a common finding associated with pain.

> I have reviewed Social Security regulation 1.04 that you pointed out to me. I agree that Ms. Sparks has a disorder of the spine including spinal stenosis, disc herniations, and degenerative disc disease that does cause compression on the right C4-C5 nerve root and is consistent with her symptoms of neck, arm, and hand pain and weakness as specified in 1.04A.

The undersigned feels compelled to note there was no evidence, with the exception of a one-page document from Plaintiff's chiropractor, submitted between early 1996 and the September 2001 MRI, based upon which this case was remanded. Plaintiff continued to treat with a chiropractor, who referred her to neurologist Riggs in February 2002. She did not seek any evaluation or treatment from a medical doctor until March 18, 2002. When the ALJ asked why she finally went to a doctor in 2002, Plaintiff testified: "I felt like I needed medication. I was, I was not doing well just with the chiropractic care" (R. 175). Yet she had "just the chiropractic care" for at least the five years prior. Even then, it appears from the record that Plaintiff saw Dr. Pallie only three times between March and June 2002. Plaintiff first saw Dr. Riggs in February 2002. At that time his only impression was that it would be worthwhile go obtain EMG studies, "looking for any additional evidence of right cervical radiculopathy or anything else that might be contributing to her right arm symptoms, such as carpal tunnel syndrome." He also recommended a neurosurgical evaluation. Plaintiff did not see Dr. Riggs again until over a year later, on March 17, 2003, when he examined her again. This was a month after the administrative hearing. On that date, Dr. Riggs's only impression was that Plaintiff had chronic neck pain with severe degenerative arthritis and degenerative disk disease. He recommended an MRI, "looking for any evidence of surgical disease as well as obtaining a functional capacity evaluation." Finally, Dr. Riggs wrote the opinion of June 16, 2003. This is the entirety of the evidence from Dr. Riggs in the record. Significantly, on her "Claimant's Recent Medical Treatment" form, submitted February 19, 2003, Plaintiff did not even mention Dr. Riggs as a doctor by whom she'd been examined or treated, although she did name Dr. Pallie and her chiropractor. From the record, therefore, it appears that Dr. Riggs was not a treating physician at the time of the administrative hearing, but had examined Plaintiff only once, a year earlier. Even Plaintiff did not regard him as a treating physician. Although Plaintiff states she was

55

scheduled for a regular appointment with Dr. Riggs on March 17, 2003, neither she nor counsel indicated that to the ALJ, or asked for time to submit additional evidence from him. The ALJ therefore appropriately scheduled Plaintiff for a consultative neurological examination, which Dr. Navada completed on April 14, 2003. Dr. Navada opined that Plaintiff's neurologic exam was essentially normal except for give away weakness. He noted subjective weakness in her arms and was unable to complete the "Abilities to do Work-Related Activities" form because Plaintiff was subjectively unable to perform even at the lowest level, in most categories.

The undersigned finds the 2003 MRI and letters from Dr. Riggs are not "material," in that they would not reasonably have changed the outcome of the case. Even if Dr. Riggs is considered a "treating physician" after three examinations in 1½ years and no apparent treatment, Dr. Riggs opined only that it was "reasonable" that an individual with Plaintiff's medical findings would experience the symptoms she alleged, and that her symptoms were "consistent" with the findings. This opinion is reasonable, but is also consistent with the ALJ's finding in his credibility analysis that Plaintiff met the first step of the credibility analysis – that Plaintiff's medically determinable impairments "could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Craig, supra (emphasis added). That impairments could cause certain symptoms, however, does not mean that they actually do in a particular individual – thus, the second step of the credibility analysis, wherein the ALJ is required to evaluate many other factors in order to determine if a particular individual's alleged symptoms are credible.

Additionally, Dr. Riggs' opinion that Plaintiff's pain would cause her to be "off task" three or more days a month or unable to perform well at least one to two hours in an eight-hour workday (less than 1/3 of a workday) is not dispositive of the issue. The VE did not testify that those limitations would preclude work. He testified that no jobs would be available if an individual was

actually <u>absent</u> from work <u>more than three days a month</u>, or "off task" <u>1/3 to 2/3</u> of a workday. These limitations may appear similar, but in fact are very different.

Finally, Dr. Riggs' opinion that Plaintiff met Listing 1.04 is an issue reserved to the Commissioner, and therefore <u>can never be entitled to controlling weight or given special significance</u>. SSR 96-5p.

Having found Dr. Riggs' opinion would not reasonably have changed the ALJ's opinion, the undersigned also finds the 2003 MRI upon which the opinion was partially based, also would not reasonably have changed his opinion. The evidence is therefore not "material."

For all the above reasons, the undersigned finds substantial evidence supports the Appeals Council's determination that the new evidence would not have changed the ALJ's decision.

## VI. CONCLUSION

The Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984). For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was not disabled through the date of his decision. The undersigned therefore recommends Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.[3]

_____

[3]Should, however, the District Judge not accept this Recommendation in full and determine this matter should be reversed and remanded, the undersigned strongly recommends said remand be limited to no earlier than March 17, 2002, the date Plaintiff presented to a medical doctor because she felt she needed medication and chiropractic treatment alone was not helping.

## VII. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI . I accordingly recommend Defendant's Motion for Summary Judgment [Docket entry 25] be **GRANTED,** Plaintiff's Motion for Summary Judgment [Docket Entries 9 and 27] be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ____ day of March, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE